IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MANASSEH R. SIMMONDS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| versus | § | CIVIL ACTION NO. 12-2109 |
| | § | |
| NATIONAL OILWELL VARCO, L.P. | § | |
| | § | |
| Defendant. | § | |

## **ORDER**

Pending before the Court is Defendant National Oilwell Varco, L.P. ("Defendant" or "NOV")'s Motion for Summary Judgment. **(Instrument No. 28)**. Also pending is Defendant's Objection and Motion to Strike **(Instrument No. 33)**, Plaintiff Manasseh Roy Simmonds ("Plaintiff" or "Simmonds")'s Motion for Leave to File Amended Response to Defendant's Motion for Summary Judgment **(Instrument No. 34),** Plaintiff's Motion for Leave to File a Sur-Reply **(Instrument No. 35)**, and Plaintiff's Motion for Leave to File an Amended Response to Defendant's Motion to Strike **(Instrument No. 40)**.

### **I.**

### **A.**

Plaintiff filed suit in this Court on July 12, 2012 against Defendant, alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act and 42 U.S.C. § 1981. (Instrument No. 1). Plaintiff's complaint is based on his original Charge of Discrimination, filed with the EEOC on April 2, 2009, and his amended Charge of Discrimination, filed with the EEOC on February 27, 2012. (Instrument No. 1). Simmonds received a right-to-sue letter from the EEOC on April 24, 2012. (Instrument No. 1).

Defendant has filed a motion for summary judgment on Plaintiff's claims. (Instrument No. 28). Plaintiff has filed a response (Instrument No. 29), an amended response (Instrument No. 30), and a second amended response (Instrument No. 31), as well as a motion for leave to file the amended responses (Instrument No. 34). Defendant has filed a reply to the motion for summary judgment (Instrument No. 32), and Plaintiff has filed a sur-reply (Instrument No. 35). Defendant has also filed a motion to strike Plaintiff's amended responses. (Instrument No. 33). Plaintiff has filed two responses to the motion to strike. (Instrument Nos. 34, 40).

**B.**

Simmonds, a 68-years-old black man, has worked as a welder since the 1970s. (Instrument No. 31-3 at 6). In 2005, Simmonds secured a temporary welding position with NOV through an employment agency, and NOV hired him full-time on January 9, 2006 to work the second shift at NOV's West Little York facility. (Instrument No. 31-3 at 8-9; Instrument No. 28-2 at 3-4). Simmonds was hired by Kenneth Trahan ("Trahan"). (Instrument No. 28-2 at 2-3). Under Trahan, Simmonds received a pay raise and a positive evaluation. (Instrument No. 31-4 at 2). On the Status Change Form, written by Trahan with approval from Human Resources, Management, and Executive, Trahan notes that Simmonds "is very dependable and he is always here and can do most jobs that we do. He is very good at Inconel inlay on doors and weld lugs. He stays busy and is not someone you have to watch." (Instrument No. 31-4 at 2).

In July 2008, leadman Joe Beene ("Beene") and Trahan counseled Simmonds for stopping work 1.5 hours before the end of his shift. (Instrument No. 28-4 at 8). On August 22, 2008, quality-control inspector Jason Stanford ("Stanford") and second-shift supervisor Juan Madrid ("Madrid") issued Simmonds a Corrective Action for "violation of company policy or procedure." (Instrument No. 28-4 at 7). The Corrective Action, also signed by Beene, notes that

Simmonds failed to comply with standard operating procedures when he did not clean his welds after each pass. (Instrument No. 28-4 at 7). He also did not read and follow the welding procedure. (Instrument No. 28-4 at 7). The Corrective Action notes, "It is imperative that all written operating procedures be followed and there is no excuse for short cuts. Further non-compliance to this verbal written warning will lead to further disciplinary actions." (Instrument No. 28-4 at 7). Simmonds refused to sign the Corrective Action. (Instrument No. 28-4 at 7). On October 21, 2008, Simmonds received another Corrective Action for the same conduct. (Instrument No. 28-4 at 6). The second Corrective Action notes that the consequence of failing to improve would be a final warning. Simmonds agreed with this warning and signed the form. (Instrument No. 28-4 at 6).

Simmonds testified that everything started to go bad when NOV hired Louis Stuckey ("Stuckey"). (Instrument No. 31-3 at 15). On December 15, 2008, Stuckey replaced Trahan as the weld shop supervisor. (Instrument No. 31-3 at 15; Instrument No. 28-3 at 2). Simmonds testified that, during the transition between supervisors, he went to speak with Trahan about a potential raise while Stuckey was in the office. (Instrument No. 31-3 at 16-17). During the conversation between Simmonds and Trahan, Simmonds informed Trahan of the dates of his upcoming vacation. (Instrument No. 31-3 at 17). Simmonds testified that Stuckey interjected, "So you going on vacation. You'll be the first one I fire when you get back." (Instrument No. 31-3 at 17). Stuckey acknowledges making the comment "as a joke," but he admits that he recognized that Simmonds "didn't take it that well." (Instrument No. 28-3 at 5). Simmonds testified that he was "confused" and "hurt" by this comment because he had never met Stuckey before, and he did not understand how Stuckey could "just pretend to fire [him]." (Instrument No. 31-3 at 17-18). He believed that Stuckey's comment was racist because the only thing that

Stuckey, who is white, knew about Simmonds at that point was that Simmonds is black. (Instrument No. 31-3 at 18).

The following week, Simmonds alleges that Stuckey approached him, introduced himself as the new foreman, and told Simmons, "[F]rom now on I want you to do whatever I tell you, even if it's right or wrong." (Instrument No. 28-2 at 29). Simmonds then left on vacation, and when he returned from vacation, he alleges that Stuckey had cut off the stud in the turntable in his workstation and replaced it with a smaller threaded screw. (Instrument No. 28-2 at 29). Simmonds testified that this change was incorrect because the smaller screw was not large enough to hold the types of products he was welding. (Instrument No. 28-2 at 29-30). He testified that Stuckey also wanted him to perform additional work. (Instrument No. 28-2 at 30-31). Simmonds objected to this change because it would not be done properly and he did not believe it would be safe. (Instrument No. 28-2 at 31). He testified that he complained about the dangerous work situation to Beene, but Beene told him not to worry about it. (Instrument No. 28-2 at 31-32).

When Simmonds asked Stuckey if he would get paid more for the extra work, Simmonds testified that Stuckey replied, "No. You a black man making more money than me." (Instrument No. 28-2 at 34-35).

On January 14, 2009, Beene wrote up a "final warning" Corrective Action regarding Simmonds's failure to clean his welds after every pass. (Instrument No. 28-4 at 5). The notice states that Simmonds was "welding over slag." (Instrument No. 28-4 at 5). Slag is "excess residue left over during the welding process. If a welder welds over slag, rather than properly cleaning the slag during the weld process, he will compromise the integrity of the weld and possibly cause the weld to fail." (Instrument No. 28-6 at 2, Stuckey declaration). Beene's

narrative notes that Simmonds's non-compliance with company procedure "caused a N.C.R. to be written on the part." (Instrument No. 28-4 at 5). An "N.C.R." is a Non-Conformance Report, which is generated when a product does not meet approved quality standards. (Instrument No. 32-7 at 1). The Corrective Action notes that Simmonds was sent home for the rest of the day and that the consequence of a failure to improve would be termination. (Instrument No. 28-4 at 5).

Simmonds testified that he has never welded over slag "a single time." (Instrument No. 28-2 at 49). He does wait to clear the metal away until after he has completed the weld, and sometimes he stops before he completes the weld. (Instrument No. 28-2 at 49). In that situation, the slag is still on the weld, but it is over the weld, not under it. (Instrument No. 28-2 at 49). He testified that Beene, Madrid, and Stanford made up the accusation that he was welding over slag as a "conspiracy" because they wanted him out of his position. (Instrument No. 28-2 at 50-51). He believes that they disliked him because he is a certified welder and they are not. (Instrument No. 28-2 at 51).

Beene's notes reflect that on March 21, 2009, he observed that Simmonds was taking longer than he should have on a particular welding task. (Instrument No. 28-4 at 3). Beene spoke to Simmonds throughout the day about his production and also showed him how to perform the weld. (Instrument No. 28-4 at 3). After that, Simmonds's speed improved. (Instrument No. 28-4 at 3). Beene's notes conclude that "[l]ack of effort is not acceptable and will be corrected on the spot." (Instrument No. 28-4 at 3). Two days later, on March 23, Beene's notes reflect that Simmonds did not multi-task as Beene had instructed him to do. (Instrument No. 28-4 at 4). When Beene talked to him about it, Simmonds "responded that [he does not] work on more than one part at a time and he refused to do what [Beene] asked of him to do." (Instrument No. 28-4 at 4). Beene referred to Simmonds's conduct as "insubordination." (Instrument No. 28-4 at 4).

Simmonds testified that he complained to Brenda Laughlin ("Laughlin"), the Human Resources Manager at West Little York, twice about the safety issues and the comment Stuckey made about firing him, but he did not tell her on either occasion that he thought Stuckey's treatment of him was racist. (Instrument No. 28-2 at 33). He only remembers telling Laughlin that Stuckey was harassing him by giving him the wrong instructions. (Instrument No. 28-2 at 41). During Simmonds's second conversation with Laughlin, he asked her to schedule a meeting with Stuckey, Madrid, and others involved with his write-ups so they could talk about what was happening. (Instrument No. 28-2 at 34). He specifically wanted to discuss Stuckey's harassment and the safety situation. (Instrument No. 28-2 at 34).

The meeting was held on March 24, 2009, with Simmonds, Laughlin, Stolasz, Stuckey, Beene, Madrid, and John Heap, the production manager, all present. (Instrument No. 28 at 9; Instrument No. 31 at 10). Simmonds testified that he discussed his safety concerns at the meeting, as well as racial discrimination. (Instrument No. 31-3 at 31). Specifically, he testified that he wanted to discuss Stuckey's comment that Simmonds was a black man making more money than Stuckey, because he wanted the supervisors to know about the comment so they could take action. (Instrument No. 31-3 at 31-32). He had not told anyone about Stuckey's comment before the group meeting on March 24. (Instrument No. 31-3 at 31-32). Simmonds testified that Stuckey was counseled about safety issues at the meeting, and that Stuckey denied making racial comments. (Instrument No. 28-2 at 63; Instrument No. 31-3 at 33). Simmonds testified that they never discussed his performance during the meeting. (Instrument No. 28-2 at 65). Simmonds further testified that the managers then asked him to leave the room. (Instrument No. 28-2 at 64). Before leaving, Simmonds testified that he asked whether he still had a job, and

Stolasz replied, "Yes, Roy, you still have your job. Just go back to your work area." (Instrument No. 28-2 at 64).

Other employees' accounts of the meeting differ from Simmond's. In particular, the other employees testified at their depositions that Simmonds did not raise any allegations of race discrimination at the meeting. For example, Stuckey testified that they only discussed Simmond's performance and Stuckey's management style. (Instrument No. 28-3 at 7-8). Laughlin testified that Simmonds complained he did not receive high profile jobs. (Instrument No. 28-5 at 2-4). Stolasz testified that he told Simmonds he was not doing what was asked of him and that Simmonds complained of Stuckey's treatment of him. (Instrument No. 28-8 at 2, 4-5, 9). Heap's notes from the meeting also do not specifically discuss any allegations of racial discrimination. (Instrument No. 32-6 at 3). Heap wrote in part, "Roy sited [sic] several examples of occasions where he felt like he was being treated harshly by his supervisor and in response to each instance it was brought out that coaching, counseling, or instruction that Roy received was due to the supervisors [sic] observation of a weak work habit or Ray's taking much too long to complete the assigned task." (Instrument No. 32-6 at 3).

Stolasz agrees that Simmonds asked if he still had a job, and Stolasz told him he did. (Instrument No. 28-8 at 7). Stolasz testified that he was not considering terminating Simmonds that day. (Instrument No. 28-8 at 7). Following the meeting, Stuckey testified that he again complained to Stolasz and Heap regarding Simmonds's performance. (Instrument No. 28-3 at 23). He complained that Simmonds's performance was the same and that nothing had changed. (Instrument No. 28-3 at 23). Stolasz also hand-wrote and signed the following notation on Heap's type-written notes from the March 24 meeting: "A few days after this meeting Louis [Stuckey] was required to speak to Roy again in reference to his lack of production, another

employee was in the office (Mercedes [Longoria]) as a witness to the conversation." (Instrument No. 32-6 at 1-3).

On March 31, 2009,[1] Simmonds testified that four of his coworkers approached him at Simmonds's workstation and said, "I saw what you're going through and I believe they trying [sic] to fire you." (Instrument No. 31-3 at 34). One of the employees was Mercedes Longoria. (Instrument No. 35-3 at 5). In Simmonds's declaration, he states that this occurred prior to the beginning of their work shift. (Instrument No. 31-1 at 5). They volunteered to be his witnesses if he was fired, and they gave him their contact information. (Instrument No. 31-3 at 34-35; Instrument No. 35-3 at 5-7). Beene approached the employees during their conversation and asked what they were doing. (Instrument No. 31-3 at 34). Simmonds testified that he told Beene that the coworkers were giving him their contact information in case he needed them as witnesses. (Instrument No. 31-3 at 35). Simmonds testified that Beene said he was going to tell Stolasz because Simmonds was talking to his coworkers and getting their contact information. (Instrument No. 31-3 at 35; Instrument No. 35-3 at 6-7).

Beene remembers approaching Simmonds and his coworkers, but Beene testified that Simmonds never told him he was collecting contact information so his coworkers could be his witnesses. (Instrument No. 28-7 at 6). Beene also testified that he never told Simmonds that he would report Simmonds to Stolasz. (Instrument No. 28-7 at 7). Beene testified that he reported Simmonds because Simmonds refused to go to work after he was told to do so, and because Simmonds was distracting other employees from working. (Instrument No. 28-7 at 12, 15-16). Beene testified that Simmonds and the other employees were all supposed to be working at that time and it was not before their shift. (Instrument No. 28-7 at 12). Stolasz testified that Beene

---

[1] The record is not clear whether the event occurred on March 31 or April 1, 2009. Plaintiff, however, testifies that it occurred the date before he was terminated, which was April 1. Neither party claims that the exact date is material to its argument. For clarity and the purposes of this Order only, the Court adopts March 31, 2009 as the relevant date.

said he could not get Simmonds to return to his workstation and Simmonds was also keeping other employees from working. (Instrument No. 28-8 at 14). Stolasz looked to see if this was true and saw that Simmonds was not at his workstation. (Instrument No. 28-8 at 15).

On April 1, 2009, Simmonds testified that Heap brought him to Stolasz's office. (Instrument No. 31-3 at 35). Stolasz told Simmonds, "I'm going to have to let you go." (Instrument No. 31-3 at 35). When Simmonds asked why, Simmonds testified that he was told, "For not doing enough work." (Instrument No. 31-3 at 35). When asked at his deposition, Stolasz testified that he terminated Plaintiff because of Plaintiff's "[c]ontinued performance problems" and failure to follow his supervisor's instructions. (Instrument No. 28-8 at 9-10). Stolasz testified that he does not normally initiate the decision to terminate an employee, but that he did in this situation because Plaintiff "was not working, and [was] keeping others from working." (Instrument No. 31-7 at 7).

## II.

### A.

Plaintiff has filed a Motion for Leave to File a Sur-Reply. (Instrument No. 35). Defendant has raised new legal theories and attached new evidence in its reply. *See* (Instrument No. 32). Therefore, Plaintiff's Motion for Leave to File a Sur-Reply is **GRANTED**. The Court will consider the sur-reply, filed as Instrument No. 35-1.

### B.

Defendant has filed a Motion to Strike Plaintiff's Amended Response, Second Amended Response and Exhibits in Opposition to Defendant's Motion for Summary Judgment. (Instrument No. 33). Defendant moves to strike Plaintiff's amended responses to the motion for summary judgment for being filed outside the deadline. In the alternative, Defendant moves to

strike certain evidence attached to Plaintiff's amended responses. Plaintiff has filed two responses to the motion to strike. The first also seeks leave to file his previously-filed amended response and second amended response to the motion for summary judgment (Instrument No. 34), and the second also seeks leave to file an amended response to the Motion to Strike (Instrument No. 40).

Defendant has moved to strike Plaintiff's Amended Response (Instrument No. 30) and Second Amended Response (Instrument No. 31) in full because they are late filed. Plaintiff timely filed his first Response on November 7, 2013, the filing deadline. (Instrument No. 29). However, the Response did not contain any evidentiary attachments. Plaintiff's counsel explains that she was unable to upload the exhibits in time because of internet connectivity problems. (Instrument No. 34 at 2). However, at 2:59 a.m. on November 8, counsel was able to file an Amended Response with exhibits. (Instrument No. 30). She then filed the Second Amended Response at 2:57 p.m. on November 8. (Instrument No. 31). She also provided the Court with a courtesy copy that date. Although both amended responses were filed under seal, counsel has demonstrated that she provided defense counsel with a copy of all filings in a timely manner. (Instrument No. 34-2 at 2; Instrument No. 34-5 at 2-4).

If the Court only looked to the original Response, which was timely filed but without evidentiary attachments, it would in effect be granting Defendant a judgment by default. The Court declines to do so. There is no evidence of bad faith by Plaintiff's counsel, and Defendant does not claim that it suffered any prejudice by the delay of less than one day.

Accordingly, Plaintiff's Motion for Leave to File Amended Response to Defendant's Motion for Summary Judgment is **GRANTED**. (Instrument No. 34). The Court will treat

Instrument No. 31, the Second Amended Response, as the relevant document. Defendant's motion to strike is **DENIED** on that ground. (Instrument No. 33).

Defendant also moves to strike certain evidence attached to Plaintiff's Second Amended Response. Specifically, Defendant moves to strike Simmonds's declaration, the declaration of one of Simmonds's coworkers, and Simmonds's EEOC charge. (Instrument No. 33).

The Court does not rely on the coworker's declaration or the EEOC charge in ruling on Defendant's motion for summary judgment. Therefore, the motion to strike these documents is **DENIED as moot**. *Brantley v. Inspectorate Am. Corp.*, 821 F. Supp. 2d 879, 886 (S.D. Tex. 2011) (Gilmore, J.).

Defendant next objects to portions of Simmonds's declaration on the grounds that they constitute conclusions of law and ultimate fact, are not based on personal knowledge, are conclusory or speculative, or constitute hearsay. (Instrument No. 33 at 11-12). Defendant also claims that one paragraph of Plaintiff's declaration conflicts with his deposition testimony. (Instrument No. 33 at 13-14). In particular, Defendant objects to Simmonds's statement that he was collecting contact information from his coworkers so they could be witnesses for his race discrimination claim. The Court does not rely on any of the specific paragraphs Defendant objects to in ruling on Defendant's motion for summary judgment. The Court cites Simmonds's declaration for only two propositions: that Stuckey never counseled Simmonds regarding his welding performance, (Instrument No. 31-1 at 4 ¶12), and that Simmonds collected his coworkers' contact information before their work shift started. (Instrument No. 31-1 at 5 ¶21). Defendant has not objected to these portions of the declaration. *See* (Instrument No. 33). Accordingly, the motion to strike Simmonds's declaration is **DENIED as moot**. *Brantley*, 821 F. Supp. 2d at 886.

Accordingly, Defendant's Motion to Strike Plaintiff's Amended Response, Second Amended Response, and Exhibits in Opposition to Defendant's Motion for Summary Judgment is **DENIED**. (Instrument No. 33).

Finally, Plaintiff has moved for leave to file a second response to Defendant's motion to strike. (Instrument No. 40). Plaintiff seeks leave to amend because the initial response to the motion to strike did not address the merits of Defendant's evidentiary objections. (Instrument No. 40 at 1-2). Because the Court has denied Defendant's motion to strike and has not relied on Plaintiff's amended response, Plaintiff's motion for leave (Instrument No. 40) is **DENIED as moot**.

## III.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).

The "movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25(1986)). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

After the moving party has met its burden, in order to "avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992). The party opposing summary judgment cannot merely rely on the contentions contained in the pleadings. *Little*, 37 F.3d at 1075. Rather, the "party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim," *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 457, 458 (5th Cir. 1998); *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Although the court draws all reasonable inferences in the light most favorable to the nonmoving party, *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008), the nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux*, 402 F.3d at 540 (*quoting Little*, 37 F.3d at 1075). Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to

defeat a motion for summary judgment." *Clark v. Am's Favorite Chicken*, 110 F.3d 295, 297 (5th Cir. 1997).

In deciding a summary judgment motion, the district court does not make credibility determinations or weigh evidence. *Chevron Phillips*, 570 F.3d 606, 612 n.3 (5th Cir. 2009). Nor does the court "sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379-80 (5th Cir. 2010); *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003); *Ragas,* 136 F.3d at 458; *Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988) (it is not necessary "that the entire record in the case ... be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"). Therefore, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

## IV.

### A.

Defendant has moved for summary judgment on Plaintiff's race discrimination claim under Title VII and 42 U.S.C. § 1981. In his response, Plaintiff withdraws this claim. (Instrument No. 31 n.39).

Accordingly, Defendant's motion for summary judgment on Plaintiff's race discrimination claim is DENIED as moot.

### B.

Plaintiff's remaining claim is retaliation under Title VII and 42 U.S.C. § 1981. (Instrument No. 1 at 6-7). At the outset, the Court notes that the Title VII legal standard applies

to Plaintiff's claims under § 1981. The Supreme Court has "h[e]ld that 42 U.S.C. § 1981 encompasses claims of retaliation." *CBOCS West., Inc. v. Humphries*, 553 U.S. 442, 457 (2008). "Here[], the courts are to use the standard that they apply in Title VII cases." *Evans-Rhodes v. Nw. Diagnostic Clinic, P.A.*, 4:13-CV-01626, 2013 WL 5603003 (S.D. Tex. Oct. 11, 2013); *see also Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). Accordingly, the Court applies the Title VII standard to Plaintiff's retaliation claims under both statutes.

"Title VII prohibits retaliation against employees who engage in protected conduct, such as the filing of a charge of harassment or discrimination." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 414 (5th Cir. 2003); *see also* 42 U.S.C. § 2000e-3(a). To establish a retaliation claim under Title VII, the plaintiff must make out a prima facie case that meets three elements: (1) the employee engaged in an activity that is protected by Title VII; (2) the employer took an adverse employment action against the employee; and (3) there is a causal connection between the protected activity and the adverse employment action. *Brazoria County v. EEOC*, 391 F.3d 685, 692 (5th Cir. 2004). A plaintiff with only circumstantial evidence must satisfy burden-shifting under *McDonnell Douglas*, 411 U.S. at 802.

The statute defines "protected activity" as opposition to any practice rendered unlawful by Title VII, including "oppos[ing] any practice made an unlawful employment practice," making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a). The anti-retaliation provision of Title VII does not protect an employee from all retaliation, but only from retaliation that produces an injury or harm. *Burlington Northern & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 67 (2006).

An "adverse employment action" under the second prong is one that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might

well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68. "'Petty slights, minor annoyances, and simple lack of good manners'" are not actionable retaliatory conduct that would dissuade a reasonable employee from making a charge of discrimination. *Stewart* v. *Mississippi Transportation Com'n,* 586 F.3d 321, 332 (2009), quoting *Burlington Northern,* 548 U.S. at 68. "'The significance of any particular act of retaliation will often depend upon the particular circumstances. Context matters.'" *Id.* at 332, citing *Burlington Northern,* 548 U.S. at 69. If the context shows no adverse impact as a result and no blame can be attributed to the employee that "might carry a stigma in the workplace," an employment action is not an adverse action. *Id.* Furthermore, where a plaintiff is not singled out for adverse treatment and many employees are treated similarly, a plaintiff cannot establish a prima facie case of retaliation. *Bryant v. Citicorp Data Systems, Inc.,* 202 F.3d 266, 266 (5th Cir. 1999).

With regard to the third prong, "a 'causal link' is established when the evidence demonstrates that the [adverse action] was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co., Inc.,* 238 F.3d 674, 684 (5th Cir. 2001) (citation omitted)." "Although the plaintiff's burden at the prima facie stage is not onerous, the plaintiff must produce at least some evidence that the decisionmakers had knowledge of [his] protected activity." *Manning v. Chevron Chemical Co., LLC,* 332 F.3d 874, 883 n.6 (5th Cir. 2003).

If the plaintiff succeeds in making a prima facie case of retaliation, a presumption of discrimination arises, and the burden shifts to the defendant employer to provide a legitimate, nonretaliatory reason for the adverse employment action. *Hockman v. Westward Communications LLC,* 407 F.3d 317, 330 (5th Cir. 2004). If the employer succeeds, the presumption of discrimination falls away and the plaintiff must show that the employer's

articulated reason for its action is merely a pretext for retaliation. *See McDonnell Douglas, 411* U.S. at 804. "An employee establishes pretext by showing that the adverse action would not have occurred 'but for' the employer's retaliatory reason for the action." *Coleman v. Jason Pharm.*, __ Fed. Appx. __, 12-11107, 2013 WL 5203559 (5th Cir. Sept. 17, 2013) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. __, 133 S. Ct. 2517, 2533-34 (2013)).

In Defendant's original motion for summary judgment, Defendant does not argue Plaintiff cannot establish a prima facie case. (Instrument No. 28 at 18). Defendant raises this argument for the first time in its reply, claiming that Plaintiff's actions in collecting contact information from his coworkers is not a protected activity. (Instrument No. 32 at 2-4). Defendant also argues that Plaintiff cannot demonstrate a causal link between either his complaints of racial discrimination at the March 24 meeting or collecting contact information and his termination. (Instrument No. 32 at 4-6). Plaintiff, in his sur-reply, objects to Defendant raising new issues in its reply. (Instrument No. 35-1 at 2). However, because the Court has granted Plaintiff leave to file his sur-reply and because clarifying issues regarding Plaintiff's protected activities is essential to considering the presence of pretext, the Court considers Plaintiff's prima facie case.

Under the first prong of the prima facie case, the Court finds that Plaintiff has presented issues of material fact relating to two separate protected activities under Title VII: the March 24, 2009 meeting at which he allegedly complained of Stuckey's racial discrimination; and the collection of contact information for witnesses. Although Defendant claims that Plaintiff's second activity is not protected because he was simply soliciting witnesses to complain about Stuckey's harsh or disrespectful treatment, not any racially discriminatory treatment, this is a misrepresentation of Plaintiff's full deposition testimony. Plaintiff testified that his coworkers volunteered to be witnesses to Stuckey's mistreatment, and he further testified that he believed

that the mistreatment was based on race. (Instrument No. 31-3 at 30-35). This is sufficient evidence for a reasonable jury to believe that Plaintiff was gathering contact information to support his claim of racial discrimination. 42 U.S.C. § 2000e-3(a). Therefore, viewing the evidence in the light most favorable to Plaintiff, the Court will consider both incidents as protected activities under Title VII.

Under the second prong, neither party disputes that Plaintiff's termination on April 1, 2009 was an adverse employment action.

Under the third prong, Defendant argues that Plaintiff cannot demonstrate a causal connection between either protected activity and the adverse employment action. (Instrument No. 32 at 5). First, Plaintiff must introduce evidence that his termination "was based in part on knowledge of the employee's protected activity." *Medina*, 238 F.3d at 684. Defendant argues that Plaintiff cannot show that Stolasz, the ultimate decision-maker, had actual knowledge that Plaintiff was gathering coworkers to act as witnesses to his claim of racial discrimination. (Instrument No. 32 at 5). Defendant admits that Beene may have had knowledge of Plaintiff's protected activity but claims that Stolasz did not. (Instrument No. 32 at 5). However, Plaintiff testified that Beene told Plaintiff he intended to report Plaintiff's activities to Stolasz. (Instrument No. 31-3 at 35; Instrument No. 35-3 at 6-7). Although Beene denies making this comment, (Instrument No. 28-7 at 6), and Stolasz denies hearing anything about Plaintiff collecting contact information, (Instrument No. 28-8 at 14), Plaintiff's testimony is sufficient evidence for a reasonable jury to believe that Beene reported Simmonds's activity to Stolasz, thereby putting Stolasz on notice.

Additionally, Plaintiff can establish the third prong of his prima facie claim by showing the temporal connection between his protected activities and his termination. *See, e.g., Strong v.*

*Univ. Healthcare Sys., L.L.C.,* 482 F.3d 802, 808 (5th Cir. 2007). "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. Gen. Servs. Admin.,* 110 F.3d 1180, 1188 (5th Cir. 1997); *Richard v. Cingular Wireless LLC,* 233 Fed. Appx. 334, 338 (5th Cir. 2007) (concluding that two and one half months is a short enough time period to support an inference of a causal link); *Raggs v. Miss. Power & Light Co.,* 278 F.3d 463, 471-72 (5th Cir. 2002) (holding that a five-month lapse, by itself, does not support an inference of a causal link). Here, Plaintiff was terminated one week after he claims that he first complained of race discrimination. This is sufficient to establish his "not onerous" prima facie burden. *See Manning,* 332 F.3d at 883 n.6. Defendant argues that the causal connection is somehow destroyed by performance reprimands that Plaintiff received after the March 24 meeting, but the case law does not support this argument. *See, e.g., Strong,* 482 F.3d at 805-08. If employers could destroy causal connections by simply continuing to discipline their employees, it would be virtually impossible for plaintiffs to establish a prima facie case of retaliation. Defendant is taking a pretext argument and disguising it as a "causal link" argument, which it cannot do. The Court therefore finds that Plaintiff has established the third prong of his prima facie case.

The burden then shifts to Defendant to provide a legitimate, nonretaliatory reason for Plaintiff's termination. *See Hockman,* 407 F.3d at 330. Defendant claims it terminated Plaintiff for his ongoing performance issues and his refusal to follow instructions from his supervisors. The Court finds that Defendant has met its burden of presenting a legitimate reason for Plaintiff's termination. The presumption of discrimination now falls away and Plaintiff must show that Defendant's articulated reason is merely pretext for retaliation. *See McDonnell Douglas, 411* U.S. at 804. Here, Plaintiff must show that, "but for" his complaint of race

discrimination at the March 24 meeting and his gathering of witness contact information, he would not have been terminated. *See Nassar*, 133 S. Ct. at 2533-34.

Plaintiff presents multiple arguments for why Defendant's articulated reason is pretext for retaliation, including his claim that Defendant's reason has changed and expanded over time. (Instrument No. 31 at 16-20). Plaintiff breaks these arguments down into approximately ten specific alleged demonstrations of pretext. However, Plaintiff's pretext arguments can be best summarized and evaluated by considering what changed between March 24, 2009, the date he allegedly first complained of racial discrimination, and April 1, 2009, the date he was terminated. *See* (Instrument No. 31 at 21-22). Stolasz, whom Defendant claims was the sole decision-maker in the case, testified that he was not considering terminating Plaintiff on March 24. (Instrument No. 28-8 at 7). Stolasz terminated Plaintiff one week later because of "[l]ack of performance." (Instrument No. 28-8 at 7). Stolasz did not give a date he determined that Plaintiff's performance was deficient, instead testifying that "[i]t was a process." (Instrument No. 28-8 at 7). Specifically, Stolasz testified that he changed his mind and decided to terminate Plaintiff because of Plaintiff's "[c]ontinued performance problems" and failure to follow his supervisor's instructions. (Instrument No. 28-8 at 9-10).

Stolasz testified that the specific continuing performance problems were that Simmonds was "not welding per specification" and "not meeting the standards set on the manufacturing documentation." (Instrument No. 32-4 at 2). However, Plaintiff argues that the documentation does not reflect Plaintiff's failure to follow standards and specifications between March 24 and April 1. (Instrument 31 at 21). Although Stolasz testified that Defendant generates Non-Conforming Reports when an employee does not weld to specification, (Instrument No. 31-7 at 8), the last Non-Conforming Report for Plaintiff was generated on March 13, 2009, before

Plaintiff complained of discrimination. (Instrument No. 32-7 at 5). Stuckey testified that he complained to Stolasz and Heap about Plaintiff's continued performance problems after March 24. (Instrument No. 28-3 at 23). Stuckey does not specify what Plaintiff's problems were, (Instrument No. 28-3 at 23), so the record is unclear if Plaintiff's continued performance problems included failing to weld per specification. Moreover, Plaintiff claims that Stuckey never counseled him regarding his welding performance. (Instrument No. 31-1 at 4). Additionally, although Stuckey testified that he "would like to believe" that he documented his complaints in writing, (Instrument No. 28-3 at 23), Defendant has not cited any such evidence in the record. The only written documentation of Plaintiff's continued performance problems between March 24 and April 1 consists of Stolasz's handwritten note, written at the bottom of Heap's notes from the March 24 meeting, that Stuckey "was required to speak to Roy again in reference to his lack of production." (Instrument No. 32-6 at 3). Lack of production, however, is arguably different from failure to follow Defendant's welding procedure, which is the performance problem Stolasz cites in support of Plaintiff's termination. Defendant has well-documented evidence of Plaintiff's alleged failure to perform according to its welding procedures as early as August 2008 and continuing through March 13, 2009. However, there is no specific, written documentation of Plaintiff's failure to follow welding specifications between March 24, the date Plaintiff allegedly first complained of discrimination, and April 1, the date he was terminated. On the above evidence, a reasonable jury could find that Defendant's performance-based reason for Plaintiff's termination was pretext for discrimination.

Additionally, Defendant claims that Plaintiff's problems culminated with his actions on March 31, 2009, when Beene informed Stolasz that Plaintiff was refusing to work and keeping others from working. (Instrument No. 32 at 9; Instrument No. 32-4 at 2). Stolasz testified that he

does not normally initiate the decision to terminate an employee, but that he did in this situation because Plaintiff "was not working, and [was] keeping others from working." (Instrument No. 31-7 at 7). Based on Plaintiff's past performance, Stolasz testified that he believed Plaintiff's actions were serious enough for an immediate termination. (Instrument No. 31-7 at 7). Plaintiff, however, argues that the work shift had not yet started. Of course, whether Stolasz is correct that Plaintiff was supposed to be working is not the relevant question. "[T]he issue is not the truth or falsity of the allegation, but 'whether the employer reasonably believed the employee's allegation and acted on it in good faith.'" *Jackson v. Cal–Western Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) (quoting *Waggoner v. City of Garland*, 987 F.2d 1160, 1165 (5th Cir. 1993)). Plaintiff argues that Stolasz was not acting in good faith when he did not fully investigate Beene's allegations. (Insturment No. 35-1 at 9). Stolasz acknowledges that he "had to go check [Beene's allegations] out for [him]self," which involved looking to see if the employees were at their workstation. (Instrument No. 28-8 at 15). However, he admits that he did not know when Simmonds was supposed to start working that day, and he did not ask Beene that question. (Instrument No. 31-7 at 7). A reasonable jury could find that Stolasz did not act reasonably and in good faith when he relied on Beene's report without a full investigation, deviated from his normal practice, and initiated Plaintiff's termination himself. *See, e.g., Garza v. Mary Kay, Inc.*, 309-CV-0255-B, 2010 WL 3260175 (N.D. Tex. Aug. 17, 2010) (evidence that defendant deviated from its normal policies and procedures can be evidence of pretext).

Furthermore, as discussed in detail above, Plaintiff has introduced sufficient evidence for a reasonable jury to believe that Plaintiff's discussion with his co-workers was both a protected activity under Title VII and that Stolasz had knowledge of the protected activity. A reasonable jury could find Stolasz terminated Plaintiff immediately upon learning of Plaintiff's activities.

The Court finds that Plaintiff has introduced sufficient evidence to raise material issues of fact as to whether Defendant's proffered reason was pretext for retaliation.

Accordingly, Defendant's motion for summary judgment on the issue of retaliation under Title VII and § 1981 is DENIED.

## V.

Based on the foregoing, IT IS HEREBY ORDERED THAT Defendant's Motion for Summary Judgment is **DENIED**. **(Instrument No. 28)**. Defendant's Motion to Strike Plaintiff's Amended Response, Second Amended Response, and Exhibits in Opposition Defendant's Motion for Summary Judgment is **DENIED**. **(Instrument No. 33)**. Plaintiff's Motion for Leave to File Amended Response to Defendant's Motion for Summary Judgment is **GRANTED**. **(Instrument No. 34)**. Plaintiff's Motion for Leave to File a Sur-Reply is **GRANTED**. **(Instrument No. 35)**. Plaintiff's Motion for Leave to File an Amended Response to Defendant's Motion to Strike is **DENIED as moot**. **(Instrument No. 40)**.

The Clerk of the Court shall provide a true copy of this Order to all counsel of record.

SIGNED on this the 16th day of December, 2013, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**